UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TERRI C. o/b/o M.N.C.,[1]

                                  Plaintiff,                  **DECISION AND ORDER**

v.

                                            1:21-cv-01266 (JJM)

COMMISSIONER OF SOCIAL SECURITY,

                                   Defendant.

_____

        This is an action brought pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to review

the final determination of the Commissioner of Social Security that M.N.C., a minor, was not

entitled to Supplemental Security Income ("SSI") benefits. Before the court are the parties'

cross-motions for judgment on the pleadings [8, 9].[2]   The parties have consented to my

jurisdiction [12].  Having reviewed their submissions [8, 9], the Commissioner's motion is

granted.

## BACKGROUND

        The parties' familiarity with the 1,794-page administrative record [6, 7] is

presumed. Further, the parties have comprehensively set forth in their papers plaintiff's treatment

and other records and the relevant medical evidence. Accordingly, I refer below only to those

facts necessary to explain my decision.

---

[1]      In accordance with the guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Western District of New York on November 18, 2020 in order to better protect personal and medical information of non-governmental parties, this Decision and Order will identify the plaintiff by first name and last initial.

[2]      Bracketed references are to the CM/ECF docket entries. Page references to the administrative record are to the Bates numbering.  All other page references are to the CM/ECF pagination.

Plaintiff's mother filed an application for benefits on her behalf on September 26, 2019, when plaintiff was nine years old (she was born in March 2010), alleging a disability beginning on August 1, 2015, due to asthma, a heart murmur, and having a pacemaker. Administrative Record [6] at 10, 11, 241.  Plaintiff later also claimed disability due to anxiety disorder.  Id. at 30 (transcript of hearing) ("the claimant also does experience anxiety disorder"). A prior application for benefits had been denied.  Id. at 10.

An administrative hearing was held on February 10, 2021 before Administrative Law Judge ("ALJ") John Carlton.  Id. at 24-49 (transcript of hearing).  Plaintiff's mother testified.  Id. at 31-48.  Plaintiff was represented at the hearing.  Id. at 26.

On April 14, 2021, ALJ Carlton issued a decision finding that plaintiff had not been disabled as defined in the Social Security Act since the date of her application.  Id. at 17. ALJ Carlton found that plaintiff's severe impairments were chronic heart failure with pacemaker placement, asthma, obesity, and anxiety.  Id. at 11. He also found that plaintiff's severe impairments did not meet the elements of a listed impairment, nor were they functionally equivalent to the severity of the listings.  Id. at 11-17.  Thereafter, this action ensued.

## DISCUSSION

In seeking remand for further administrative proceedings, plaintiff argues that ALJ Carlton erred in two ways:

1. by failing to develop the record concerning plaintiff's anxiety disorder (plaintiff's Memorandum of Law [8-1] at 9-14); and

2. by rejecting Dr. Hongbiao Liu's July 2018 opinion concerning plaintiff's ability to tolerate pulmonary irritants as "irrelevant because it was 'remote to the application date'" (id. at 15).

Specifically, plaintiff argues that ALJ Carlton lacked medical expert evidence to support his

finding that plaintiff had "less than marked" limitations in multiple domains due to her anxiety

disorder.  Had he further developed the record or properly analyzed evidence already in the

record, he could have determined that plaintiff's limitation in the domain of caring for herself

was marked.  Id. at 12.  Plaintiff further argues that, had ALJ Carlton considered the limitations

opined by Dr. Liu in the context of plaintiff's limitations in the domain of health and physical

well-being, he could have found plaintiff's limitations in that domain "extreme" as opposed to

"marked".  Id. at 16.

The Commissioner responds that substantial evidence supports the ALJ's

functional equivalence findings.  Commissioner's Brief [9-1] at 6.  More specifically, the

Commissioner argues there was no gap in the record that required further development, and the

ALJ properly analyzed the evidence already in the record concerning plaintiff's anxiety

diagnosis and symptoms.  Id. at 11-19.  With respect to Dr. Liu's report, the Commissioner

argues that the ALJ correctly ascertained the relevant period for SSI claims and that, in any

event, Dr. Liu's opinions and the remaining record evidence cited by the ALJ support his finding

that plaintiff had a marked, rather than extreme, limitation in the functional area of health and

physical well-being.  Id. at 20-21.  For the following reasons, I agree with the Commissioner.


A.      **Standard of Review**

"A district court may set aside the Commissioner's determination that a claimant

is not disabled only if the factual findings are not supported by 'substantial evidence' or if the

decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42

U.S.C. §405(g)).  Substantial evidence is that which a "reasonable mind might accept as

adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305

U.S. 197, 229 (1938).  "In reviewing a final decision of the SSA, this Court is limited to

determining whether the SSA's conclusions were supported by substantial evidence in the record

and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013).

*See also* Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019); Colgan v. Kijakazi, 22

F.4th 353, 359 (2d Cir. 2022) ("[a]lthough . . .  the evidentiary threshold for the substantial

evidence standard 'is not high,' . . . the substantial evidence standard is also not merely

hortatory: It requires relevant evidence which would lead a 'reasonable mind' to concur in the

ALJ's factual determinations").

  "For SSI applications, the relevant period is between the date of the application

and the date of the ALJ's decision".  Leisten v. Astrue, 2010 WL 1133246, *1, n. 2 (W.D.N.Y.

2010).  Accordingly, the issue here is whether plaintiff was disabled between September 26,

2019, the date her claim was filed, and April 14, 2021, the date of ALJ Carlton's decision.

### B.    The Infant Disability Standard

  A claimant under 18 years of age is "disabled" under the Social Security Act

("SSA") if she has a medically determinable physical or mental impairment (or combination of

impairments) that results in "marked and severe functional limitations . . . which has lasted or

can be expected to last for a continuous period of not less than 12 months".  42 U.S.C.

§1382c(a)(3)(C). Under the applicable regulations, plaintiff must show that she is not working,

that she has a "severe" impairment or combination of impairments, and that the impairment or

combination of impairments is of listing-level severity - *i.e.*, medically or functionally equal to

the severity of a listed impairment. 20 C.F.R. §§416.924(a)-(d).  "The burden of proof rests on

the claimant at each of the three steps." Brown o/b/o C.M.B. v Colvin, 2014 WL 7272964, *3

(W.D.N.Y.  2014) (internal alterations omitted).

Functional equivalence of limitations in children is evaluated in six domains:

acquiring and using information; attending and completing tasks; interacting and relating with

others; moving about and manipulating objects; caring for oneself; and health and physical well-

being.  20 C.F.R. §§416.926a(b)(1)(i)-(vi).  Marked limitations in two domains of functioning or

an extreme limitation in one domain constitutes functional equivalence to a listed impairment.

Id. §416.926a(d).  Plaintiff challenges the ALJ's analysis in the domains of caring for oneself

and health and physical well-being.  See Plaintiff's Memorandum of Law [8-1] at 12, 16.  ALJ

Carlton found that Plaintiff had a "less than marked" limitation in he domain of caring for

oneself, and a "marked" limitation in the domain of health and physical well-being.

Administrative Record [6] at 14, 17.

The SSA's regulations discuss the functional elements of each domain and

describe the abilities assessed under each to determine if a child has a marked or extreme

limitation, and provides some examples of possible limitations under each domain.  See 20

C.F.R. §416.926a.  A "marked" limitation in any domain exists when a claimant's

"impairment(s) interferes seriously with your ability to independently initiate, sustain, or

complete activities." Id. §416.926a(e)(2)(i).

The domain of caring for yourself concerns how well a child is able to "maintain

a healthy emotional and physical state, including how well you get your physical and emotional

wants and needs met in appropriate ways; how you cope with stress and changes in your

environment; and whether you take care of your own health, possessions, and living area". Id.

§416.926a(k).  Generally, this domain of functioning includes "employ[ing] effective coping

strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and

intentions".   Id. §416.926a(k)(1)(ii).  Children aged 6 to 12 should "begin to develop

understanding of what is . . . acceptable and unacceptable behavior.  You should begin to

demonstrate consistent control over your behavior, and you should be able to avoid behaviors

that are unsafe or otherwise not good for you".  Id. §416.926a(k)(2)(iv).  Examples of limited

functioning in this domain could include "express[ing] frustration by destroying school

materials" or "engag[ing] in self-injurious behavior".  SSR 09-7p, Title XVI: Determining

Childhood Disability – The Functional Equivalence Domain of "Caring for Yourself", 2009 WL

396029, *3, *6  (2009).

       The domain of health and physical well-being concerns "the cumulative physical

effects of physical or mental impairments and their associated treatments or therapies" on a

child's functioning.  20 C.F.R. §416.926a(l).  "[L]imitations in your physical functioning

because of your treatment" are considered in this domain.  Id.  The Commissioner may consider

a child to have a marked limitation in this domain if he or she is:

> "Frequently ill because of your impairment(s) or have frequent
> exacerbations of your impairment(s) that result in significant,
> documented symptoms or signs.  For purposes of this domain,
> 'frequent['] means that you have episodes of illness or
> exacerbations that occur on an average of 3 times a year, or once
> every 4 months, each lasting 2 weeks or more.  We may also find
> that you have a 'marked' limitation if you have episodes that occur
> more often than 3 times in a year or once every 4 months but do
> not last for 2 weeks, or occur less often than an average of 3 times
> a year or once every 4 months but last longer than 2 weeks, if the
> overall effect (based on the length of the episode(s) or its
> frequency) is equivalent in severity."

Id. §416.926a(e)(2)(iv).  An "extreme" limitation in this domain indicates that a child is

"frequently ill because of your impairment(s) or have frequent exacerbations of your

impairment(s) that result in significant, documented symptoms or signs substantially in excess of

the requirements for showing a 'marked limitation'". Id. §416.926a(e)(3)(iv).


**C.     ALJ Carlton's Analysis of Plaintiff's Functional Limitations is Supported by Substantial Evidence**

"In reviewing a final decision of the SSA, this Court is limited to determining

whether the SSA's conclusions were supported by substantial evidence in the record and were

based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013). Here,

ALJ Carlton included in his decision significant analysis of the opinion and other evidence. I

agree with the Commissioner that ALJ Carlton's conclusions concerning the severity of

plaintiff's impairment in the domains at issue are amply supported by his analysis and consistent

with evidence in the record. Accordingly, I find that ALJ Carlton's decision is supported by

substantial evidence.

ALJ Carlton found that plaintiff has a "less than marked" limitation in the domain

caring for oneself and a "marked" limitation in the domain of health and physical well-being.

Administrative Record [6] at 14. In support of his conclusions, he outlined the opinion and other

evidence in the record, including medical and other evidence related to plaintiff's anxiety and

asthma, described how persuasive he found the opinion evidence, discussed which portions of

the opinions he assessed were consistent with other evidence in the record, and explained why he

found less persuasive those portions of the record that could support a finding of greater

limitation. Id. at 14-17. I address each of these functional domains separately.

1.              **Domain of Caring for Herself**

I do not agree with plaintiff that ALJ Carlton had "no medical expert evidence" upon which to base his finding that plaintiff had "less than marked" limitations in this domain, or that the ALJ was required on this record to order a consultative examination. Plaintiff's Memorandum of Law [8-1] at 9, 11. As noted by plaintiff, there are several notations in the record concerning anxiety.

Plaintiff's pediatric cardiologist noted in his March 30, 2019 treatment note that plaintiff had complaints concerning her pacemaker device shocking her. The cardiologist was able to "reproduce this during interrogation by pacing at different rates/outputs, holding pacing, and placebo maneuvers such as changing stored electrogram parameters". Id. at 1335. He felt the reported shocking sensation was "a somatic manifestation of her device related anxiety." Id.

Plaintiff got a different pacemaker implanted in June of 2019 and visited with her cardiologist for a follow up visit on September 25, 2019. Plaintiff's mother reported going for a pacemaker check at plaintiff's former doctor's office, where she reported that they "shocked" the plaintiff during the pacemaker check. Id. at 1081. Her doctor explained that he believed the reported "shock" was "the discomfort of VVI pacing for the threshold check". Id. Upon examination, plaintiff appeared healthy and "in no distress". Id. at 1082. He concluded the plaintiff "has done well" since the device revision and that "[s]he is completely recovered from the procedure with no complications". Id. at 1084. He noted that plaintiff "had a complete emotional meltdown at the idea of a pacemaker check and would barely let the programmer near her". Id.

Less than one month later, on October 15, 2019, plaintiff's brother-in-law took plaintiff to her primary care physician because plaintiff had complained of chest pain and

dizziness at school and the nurse wanted her to be checked before returning to school.  Id. at

1390.  Plaintiff's brother-in-law reported that plaintiff had been "manipulative to find ways of

getting out of school[.]  Will pick her own nose to make it bleed to be sent home[.]  She now

knows what to say (regarding heart) to get out of school[.] Told school Friday she was dizzy and

got sent home.  Child admitted she faked this."  Id.  The plaintiff stated she "[d]oes not like

school. . . . Admits another boy in school [was] bullying her".  Id.

On December 16, 2019, plaintiff presented to the emergency department "with

epistaxis" (*i.e.* a nosebleed) "for the past 3 days which resolve[d] at home with pressure".  Id. at

1459.  Her nose started bleeding again in the emergency department, and staff "[a]pplied

neosynephrine soaked gauze which resolved the bleed".  Id. at 1461.  She was "[a]dvised to

continue to use neosynephrine and saline spray to keep the mucosa moist".  There is no notation

in this record that plaintiff's nosebleed was suspected to be self inflicted.

Plaintiff was seen in the emergency department again on January 1, 2020 with

complaints of abdominal pain and throat pain, but denied any vomiting.  Id. at 1428.  Upon

examination, her mental status was noted to be "[c]ooperative", with "appropriate mood [and]

affect"  Id. at 1430.  She was discharged and advised to follow up with her primary care

physician.  Id.  Plaintiff was sent home from school on January 21, 2020 "for vomiting" and was

seen again in the emergency department on January 22, 2020.  Id. at 1508.  Plaintiff also reported

abdominal pain, nausea, and diarrhea.  Id.  Upon discharge, she was advised to follow up with

her primary care physician.  Id. at 1510.

Plaintiff received a diagnosis of anxiety disorder in February 2020 after visiting

her primary care doctor because she had been vomiting at school several times per week.

Administrative Record [7] at 1575, 1577.  Plaintiff's brother-in-law, who took the plaintiff to the

visit, reported that plaintiff had been missing 2-3 days per week for several months.  It was his feeling that plaintiff was vomiting intentionally to stay home.  Id. at 1575.  The doctor concluded plaintiff's vomiting was "most likely self-induced, likely related to some school phobia and desire to go home".  Id. at 1577.  However, he felt there "may also be a GERD component" and placed her on medication, which she was still using two months later.  Id. at 1577, 1571.  Plaintiff was given a referral to a psychologist for counseling.  Id. at 1577.

At a visit on April 17, 2020, plaintiff reported she "only had one asthma flair up this year", and did not report any vomiting or psychiatric symptoms.  Id. at 1571.  She was advised to "[a]void any respiratory irritants, especially cigarette smoke, and irritants which might have been noted to flare wheezing or cough in the past".  Id. at 1572.  Plaintiff's anxiety diagnosis was not discussed, nor did plaintiff report any psychiatric symptoms.

Plaintiff reported to a WellNow on July 22, 2020 with complaints of dizziness and vomiting.  Id. at 1667.  She had no abdominal tenderness and her EKG was normal.  She was discharged to home are and instructed to follow up with her doctor.  Id.  At her well child visit on October 22, 2020, plaintiff did not note any complaints concerning vomiting or anxiety.  Id. at 1669.  She complained of pain in her ankle.  Id.  Her asthma was noted to be "uncomplicated" and plaintiff was again advised to "[a]void any respiratory irritants, especially cigarette smoke, and irritants which might have been noted to flare wheezing or cough in the past".  Id. at 1671.  Her anxiety diagnosis was noted and plaintiff's treating nurse practitioner stated that he discussed with plaintiff "way[s] to naturally deal with depression and anxiety", such as sleep, exercise, fresh air, and a healthy diet.  Id.  No other recommendations were made, nor was plaintiff referred for counseling.  There is no indication in this treatment note that any attempts were being made by either plaintiff's doctor's office or her mother to arrange counseling.

Plaintiff's attorney requested that plaintiff's treating doctor complete a Treating

Medical Source Statement.  In response, Dr. Ferguson stated on February 6, 2021:

> "[Plaintiff] has medical problems includ[ing] Junctional
> Bradycardia, pacemaker placement and asthma.  She was felt to
> have some school related anxiety 2/5/2020.  After thoroughly
> reviewing this form and its exploration of [plaintiff's] mental
> health, DSM-10 Axis, mental health review, IQ and any functional
> abilities, I feel that it will be best completed by a psychologist."

Id. at 1784.

The ALJ discussed each of these records and the findings contained therein.

Administrative Record [6] at 15-16.  He also considered three separate Teacher Questionnaires

completed by plaintiff's fourth grade teacher, Pamela Bianca.  Id. at 16, discussing id. at 250-257

(October 21, 2019), 264-74 (December 17, 2019 form), and 299-306 (September 3, 2020 form).

Ms. Bianca noted some "slight problem[s]" in some activities in the "attending and completing

tasks" functional domain in October 2019, but no problems in any functional domain in

December 2019.  She did, however, indicate on the December 2019 form that plaintiff "has

missed may days or has gone home early".  Id. at 267.  She indicated on both forms that plaintiff

had a heart condition and did not participate in gym.  In December 2019, she also noted that

plaintiff used an inhaler and indicated that plaintiff "frequently miss[ed] school due to illness".

Id. at 256, 273.

On the September 2020 form, Ms. Bianca noted that she had not seen plaintiff

since March of the previous school year.[3]  She indicated up to a "moderate problem" in two

activities under the "attending and completing tasks" functional category and three activities

under the "caring for himself or herself" functional category.  Id. at 301, 304.  She also checked

the box indicating plaintiff had "a serious problem" "identifying and appropriately asserting

---

[3]         Schools shut down and shifted to remote learning in March of 2020 due to the pandemic.

emotional needs" and explained, "[plaintiff] has anxiety.  She would often make herself vomit so

she could go home".  Id. at 304.  The ALJ concluded that the noted limitations were "consistent

with less than marked limitation and persuasive, as it is supported by the record."

       ALJ Carlton determined that "[o]verall, the record supports a finding that the

child has 'marked' limitations in her health."  Id. at 17.  Concerning plaintiff's anxiety, ALJ

Carlton explained that "[d]ue to anxiety . . . the child has 'less than marked' limitation in all

other domains, but no issues in acquiring information".  Id.  He explained further that he "has

also considered the child's anxiety, manifesting as vomiting and avoiding school and finds the

child has 'less than marked' limitation in her ability to complete tasks, interact with others, and

care for herself".  He found:

> "It is important to note that the child's mother did not follow-up
> with care after the emergency admissions and the child missed
> school because the mother did not have time to bring the child to
> school or provide on-line classes. . . . The teachers even noted that
> CPS (Child Protective Services) were involved to improve the
> child's attendance . . . . The claimant has not seen her cardiologist
> since September 2019 and her heart issues are managed well with
> the pacemaker . . . The child never followed up with a
> psychotherapist or counseling . . . however, she does have a
> diagnosis of anxiety".

Id.

       Based upon this record, I find that the ALJ adequately explained his reasoning for

finding a less than marked limitation in this domain based upon plaintiff's anxiety, and identified

the evidence he used to support his finding.  The ALJ had no obligation to develop additional

evidence.  Medical records do not appear to be missing, and the ALJ had the benefit of a

complete and legible treatment record.  Lowry o/b/o J.B. v. Astrue, 474 F. App'x 801, 804 (2d

Cir. 2012) ("where there are no obvious gaps in the administrative record, and where the ALJ

already possesses a complete medical history, the ALJ is under no obligation to seek additional

information in advance of rejecting a benefits claim"); *compare* Pratts v. Chater, 94 F.3d 34 (2d

Cir. 1996) ("[m]uch of Pratt's medical history is missing . . . the medical records that do appear

in the record are frequently incomplete or illegible and provide no coherent overview of Pratt's

treatment").

        I agree with plaintiff that the ALJ appears to misstate the record when he notes

that "the <u>child missed school</u> because the mother did not have time to bring the child to school or

provide on-line classes".  Administrative Record [6] at 17 (emphasis added), *see also* Plaintiff's

Memorandum of Law [8-1] at 12-13.  In fact, plaintiff's mother testified that she had not <u>taken</u>

<u>plaintiff for a follow up visit with her cardiologist</u> because she lacked the time due to caring for

her mother, who also had health conditions, and because of her car:

> "Q:    [W]hy weren't you back -- before the pandemic, why
> weren't you back to cardiology?
>
> A:    My mom's 84 years old, and I take care of her too.  And
> my mom has a heart problem too, so my mom's been very sick.
> And I explained to them that it's hard for me: cause I'm the only
> one that takes her back and forth to the doctor, who does anything.
> . . . And they said, well, just keep an eye on her and if --
> everything's okay, and the machine's working all right, : cause
> they're monitoring it.  She's fine if you can -- you know, if you
> want to wait until like later in the future, later, as long as they can
> like see what's going on with it.  Because the pacemaker
> machine's gotta be right here in her bag . . . so in case they do a
> test on it.  . . . so they can tell.  So I told them well, okay, then I'll
> bring her then in, you know, 2021, I'll bring her in March when the
> weather's better, : cause I have a real old car and, you know, all the
> way in Rochester.  It's hard for me to get back and forth in the
> wintertime."

Administrative Record [6] at 41.  However, it also appeared from the mother's testimony that the

plaintiff's most absences for the majority of the current school year were related to computer or

other issues, as she was attending school virtually at the time:

> "Q:    Well, why is she missing online?

A:      Well, I called the school the other day, and she's having a problem with the computer.  We gotta take it in like next week to get updated.  Because she tries to go on it, and she'll be on it for a few minutes, and then, the computer boots her off, where it won't let her back on to it.

Q:      Okay.  So when did that start happening in that she's having a problem with this computer?

A:      It started like a month ago.  We brought it in to get fixed, they fixed it.  Then she started going back on it, and it just keeps doin' it.  So, they told me to bring it in so they can see what's wrong with it.

Q:      Okay.  So, you say it started about a month ago, so before that, was she actually attending online every day like she was supposed to be?

A:      Yes.  Yes, I try to make sure she does."

Id. at 35-36.

Under these circumstances, I do not agree with plaintiff that the ALJ's error warrants remand.  ALJ Carlton did not appear to misstate or cherry-pick any of the other evidence or the medical records, and the plaintiff has not highlighted any other misstatements or mischaracterizations in her papers.  On this record, I find that ALJ Carlton's error misstating the non-impairment-related reason for plaintiff missing school - when there was a non-impairment-related reason stated in plaintiff's mother's testimony - was, at most, a harmless error.

Plaintiff also argues that "the ALJ absolutely needed to evaluate if [plaintiff's] poor school attendance was a symptom of her anxiety and school phobia - rather than a personal failing on the part of her mother.  Yet he did not.  ALJs are not allowed to look at 'symptoms' of a behavior disorder as simply 'choices.'"  Plaintiff's Memorandum of Law [8-1] at 13.  I agree that an ALJ is not at liberty to characterize, and dismiss, behavioral symptoms of a mental condition as "choices", however, the ALJ did not do that here.

-14-

ALJ Carlton expressly outlined, considered, and discussed all the record evidence

concerning the plaintiff's anxiety diagnosis.  Administrative Record [6] at 15-16.  He

"considered the child's anxiety, manifesting as vomiting and avoiding school".  Id. at 17.  He

considered the evidence of plaintiff missing school and the various reasons stated in the record

for her poor attendance.  He also found it significant that plaintiff's mother had not pursued

treatment for plaintiff's anxiety condition, even after the emergency department visits, and that

the record contained evidence suggesting that the school may have involved Child Protective

Services to address the attendance issue.  Id. at 17.

All of these facts suggest that the plaintiff's conditions were not as large a

component in plaintiff's absences as her mother now claims, and the ALJ was entitled to weigh

this evidence to conclude that the plaintiff's impairment-related limitations in the domain of

caring for herself were less than marked.  Based upon this record, the ALJ satisfied his obligation

to "construct an accurate and logical bridge between his recitation of the facts and the

conclusions he reached".  Lopez obo Y.T. v. Commissioner, 2020 WL 4504987, *2 (W.D.N.Y.

2020) (internal quotation omitted).  Although there is evidence in the record that could support

different findings, "there is substantial evidence to support the ALJ's decision.  The

Commissioner, not the Court, is responsible for weighing conflicting evidence." Pagan o/b/o

Delgado v. Barnhart, 409 S.Supp.2d 217, 220 (W.D.N.Y. 2006).

 

2.          **Domain of Health and Physical Well-Being**

I reach the same conclusion with respect to the ALJ's conclusions concerning the

severity of plaintiff's limitations in the health and physical well-being functional domain.

Plaintiff argues that "[t]he ALJ's failure to reconcile Dr. Liu's limitations was decidedly a

harmful error" because he failed to "look at her heart condition *and* her asthma in combination".

Plaintiff's Memorandum of Law [8-1] at 16.  I do not agree.  ALJ Carlton explicitly, and

properly, considered plaintiff's asthma condition in his decision.

ALJ Carlton devoted an entire paragraph of his decision to Dr. Liu's report and

conclusions.  Administrative Record [6] at 16.  Although he noted that Dr. Liu's report of his

July 2018 examination of plaintiff was "consistent with the record and persuasive", he

nonetheless found it was "not relevant" because the opinion "is remote to the application date".

Id.  Plaintiff argues that this conclusion was improper because it was "offered just two months"

before the "relevant period began" on September 14, 2018 (*i.e.* one year prior to the application

date).  However, "[f]or SSI applications, the relevant period is between the date of the

application and the date of the ALJ's decision".  Leisten v. Astrue, 2010 WL 1133246, *1, n. 2

(W.D.N.Y. 2010).  Accordingly, the issue here is whether plaintiff was disabled between

September 26, 2019 and April 14, 2021, the date of ALJ Carlton's decision.  The ALJ did not

err, therefore, by finding that Dr. Liu's report was not relevant to the plaintiff's condition over a

year later.

Further, ALJ Carlton relied upon other, more timely evidence of plaintiff's

asthma condition to make his findings.  For example, he referenced plaintiff's April 17, 2020

treatment note which stated that plaintiff  reported she "doing well and only had one asthma

attack all year".  Administrative Record [6] at 15, citing id. at 1571 (exhibit 25F).  He also

considered the plaintiff's October 22, 2020 treatment note, in which plaintiff's asthma was noted

to be "uncomplicated", and plaintiff was advised to "[a]void any respiratory irritants, especially

cigarette smoke, and irritants which might have been note to flare wheezing or cough in the

past".  Id at 15-16, citing id at 1670-71 (exhibit 27F).  Notably, this recommendation is similar to

the recommendation in Dr. Liu's report that plaintiff "should avoid dust and other irritant factors leading to asthma attack" and his indication on the check box form attached to his report that plaintiff could "never" "tolerate exposure" to "humidity and wetness" and "dust, odors, fumes and pulmonary irritants". Id. at 1060, 1065.

Here, contrary to plaintiff's arguments, ALJ Carlton demonstrated in his decision that he considered relevant and timely evidence of plaintiff's asthma condition when he made his determination concerning the severity of plaintiff's limitation in the health and physical well-being functional domain.  Further, the frequency of plaintiff's asthma attacks, as reported to her doctor, do not approach the frequency or severity required for even a marked limitation. See 20 C.F.R. §416.926a(e)(2)(iv).  Again, ALJ Carlton satisfied his obligation to "construct an accurate and logical bridge between his recitation of the facts and the conclusions he reached" with respect to this functional domain.  Lopez obo Y.T., supra.  Accordingly, his determination with respect to this domain is supported by substantial evidence.

## CONCLUSION

For these reasons, the Commissioner's cross-motion [9] is granted, and plaintiff's motion [8] is denied.

**SO ORDERED**.

Dated:  March 15, 2024                                      ___/s/__Jeremiah J. McCarthy_____
                                                                                JEREMIAH J. MCCARTHY
                                                                                United States Magistrate Judge